IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Constance J. Pollock,** | : | |
| **Plaintiff,** | : | |
| v. | : | Case No. 2:11-cv-581 |
| **State Farm Mutual Automobile Insurance Company,** | : | **JUDGE ALGENON L. MARBLEY** |
| | | Magistrate Judge Kemp |
| | : | |
| **Defendant.** | : | |

**OPINION AND ORDER**

This insurance dispute is before the Court by way of two separate motions. First, Plaintiff moved to strike Defendant State Farm Mutual Automobile Company's designation of an expert witness who intends to express certain medical opinions relating to the coverage issue present in this case. Second, State Farm moved for a protective order limiting the scope of questioning of its representatives at a Rule 30(b)(6) deposition, a motion which the Magistrate Judge granted, and which Plaintiff has asked the Court to reconsider. For the following reasons, the Court will **DENY** both the motion to strike and the motion for reconsideration.

**I. Background of the Motions**

This is a relatively simple case, at least in terms of a description of the issues. Plaintiff, Constance J. Pollock, was the victim of a rear-end collision which occurred in July, 2009. She experienced back pain after the accident which did not respond well to treatment. Ms. Pollock had also suffered from morbid obesity for a number of years prior to the accident. About nine months after the accident, she had lap band surgery, a treatment for obesity. She claims that the surgery was needed as a result of the accident; State Farm, which insured the driver of the car

and provided medical payments coverage, disagrees. It refused to pay for that treatment, and this lawsuit resulted.

### A. The Motion to Strike

Ms. Pollock's motion to strike is directed to Dr. Mikami, an expert identified by State Farm. As she notes in her brief, the expert witness disclosure deadline set in the initial pretrial order was originally January 1, 2012, but it was extended to February 1, 2012. State Farm identified Dr. Mikami on that date, but did not provide a report. It explained that its inability to do so resulted from Ms. Pollock's failure to produce her medical records.

Although one party to litigation cannot ordinarily complain about another party's failure to meet a deadline when the first party's actions have caused the delay, Ms. Pollock claims that State Farm's excuse is inadequate here because (1) she provided all of her pertinent medical records well before the deadline; (2) any additional medical records which State Farm requested are not pertinent; and (3) State Farm's other expert, Dr. Rutherford, had no trouble preparing an expert report from the records she did provide. As proof of this last proposition, she attached a copy of Dr. Rutherford's report to her motion to strike.

In its opposing memorandum, State Farm asserts that it retained two different experts for different purposes - one, Dr. Rutherford, to express opinions about Ms. Pollock's post-injury medical records, and another, Dr. Mikami, to do the same with respect to the pre-injury medical records. However, Ms. Pollock initially refused to produce the pre-injury records voluntarily. State Farm moved to compel their production, and after a discovery conference held in February, 2012 (after the date by which State Farm was to produce its expert reports), Ms. Pollock finally agreed to sign authorizations for the release of those records. When State Farm

filed its memorandum in opposition to the motion to strike on April 3, 2012, it had still not received any of the records.

Responding to Ms. Pollock's contention that the pre-injury records are not relevant or needed for Dr. Mikami to prepare a report on the issue of medical necessity, State Farm argues that in order for Ms. Pollock to prove her claim that State Farm refused to pay for surgery that was medically necessary as a result of the accident, she has the burden to show a causal relationship between the injuries she sustained in the collision and the need for the lap band surgery, and that her pre-accident records may reveal that her back pain (and the need for her to have lap band surgery to alleviate it) arose from other causes, or that it was unnecessary because there were other ways for her to have lost weight, or that the real reason for the surgery was unrelated to her back pain in the first instance. Whatever the records show (or do not show), it would be premature, State Farm contends, to ask Dr. Mikami to express a final opinion before he had the chance to look at them.

Ms. Pollock's reply is brief. Citing again to this Court's decision in *Haynes v. City of Circleville*, 2005 WL 3263313 (S.D. Ohio December 1, 2005), she argues that the relevant factors in deciding whether to extend an expert witness identification deadline are the need to preserve the integrity of the Court's scheduling order and the diligence, or lack of diligence, on the part of the dilatory party, and that delaying the production of an expert's report pending the receipt of irrelevant information cannot constitute reasonable diligence. In further support of this argument, she notes that State Farm denied her claim for reimbursement without the benefit of any of these records, so it apparently did not need the records in order to satisfy itself that the lap band surgery was not a medically necessary response to the back injury she suffered in the

3

accident. She also contends that had Dr. Mikami really needed to see these records, he should still have prepared a report by February 1, 2012, and then asked for leave to supplement that report if anything in the pre-injury records changed or further supported his initial opinions. Finally, she asserts that to the extent that these records might show that either her obesity or some type of back pain pre-dated the collision, those facts are undisputed, and that State Farm must have had some other, illegitimate motive for asking for these records.

### B.  The Motion to Reconsider

The motion to reconsider relates to an order issued by the Magistrate Judge which granted State Farm's motion for a protective order. State Farm moved for protection in response to a Rule 30(b)6) deposition notice served by Ms. Pollock which, among things, expressed the intent to inquire about any incentives State Farm may have offered to its claims handlers either not to pay, or to pay only modest amounts, on the type of claims involved in this case. State Farm took the position that because this case has been bifurcated, with the issue of whether the lap band surgery was a medically necessary response to the injuries Ms. Pollock sustained in the collision to be tried first, discovery about its claims handling process - including any incentives its agents might have had to deny the claim - is not relevant at this stage of the case. The Magistrate Judge agreed, holding that "any motives which [State Farm's] claims employees might have had to deny Ms. Pollock's claim are not relevant to the coverage issue" because the credibility of lay witnesses does not often, if ever, inform the Court's construction of an insurance contract, and the issue under this contract is a medical one on which experts, not claims handlers, will testify. *Report and Recommendation*, Doc. 38, at 4-5.

In support of her motion, Ms. Pollock continues to argue, as she did in her opposition to

the motion for a protective order, that it has been shown in other cases that there was a systemic bias operating at State Farm which gave claims handlers various incentives, including bonuses and raises, not to pay claims or not to pay them at fair value.  Ms. Pollock contends that any jury evaluating State Farm's decision not to pay for her lap band surgery would be entitled to this information so that it can better judge the correctness of that decision in this case.  She argues that other courts have come to this same conclusion, citing to a recent decision from a West Virginia Circuit Court, *Williams v. Hodgeson*, Civil Action No. 11-C-119 (June 4, 2012), which held that an insured who disagreed with State Farm's evaluation of her claim was entitled to such evidence in order to discredit the valuation method used by State Farm and to persuade the jury that State Farm's method was incorrect.  Ms. Pollock also asserts that, contrary to the conclusion reached by the Magistrate Judge, the issue of the relationship between the injuries sustained in the collision and the lap band surgery will not necessarily be decided solely on the basis of expert testimony, and that evidence of systemic bias will be important to enable her to cross-examine any State Farm employee who might testify on the issue.

    In opposing the motion to reconsider, State Farm, in addition to reiterating its position that evidence of bias is completely irrelevant to whether Ms. Pollock needed to have lap band surgery because of the accident, points out the malleable nature of Ms. Pollock's arguments about why this evidence is pertinent on the liability issue.  After State Farm resisted the discovery initially on grounds that the information sought was relevant, if at all, to the bad faith or punitive damage claim (which will not be tried unless Ms. Pollock prevails on her claim of medical necessity), she claimed a need for this information on grounds that it was relevant to State Farm's motive in denying reimbursement.  After the Magistrate Judge rejected that

5

argument because motive is not typically an issue in a breach of contract action, especially when any issue of bad faith or punitive damages has been severed for later determination, she now claims that the evidence is needed to show not motive but bias, prejudice, or credibility. State Farm also distinguishes the *Williams* decision on grounds that it dealt not with the question of whether a particular medical procedure was necessary, but a question of how to value a claim which had been allowed in principle - a much different inquiry, and one which might well turn on reasons why State Farm representatives might have wanted to undervalue it. Such a claim, which was for uninsured motorists' benefits and not for medical payments, also has, according to State Farm, subjective elements in it which cannot be judged under a completely objective standard.

      In reply, Ms. Pollock repeats her argument that the evidence can be used to inform the jury's credibility determination. She also asserts, for the first time, that because, under the policy in question, a medically necessary procedure is defined as a procedure needed to allow the claimant to achieve maximum medical improvement for the injury sustained in the covered event, she should be allowed to question State Farm's representatives about their understanding of this language and how they applied it to her claim. She points out that State Farm, under the auspices of the protective order, refused to allow its witnesses to answer any questions on this subject matter. If, in fact, there is a subjective or interpretive element in the policy language that goes beyond a completely objective determination of medical relatedness, Ms. Pollock argues that State Farm's claims handlers can legitimately be questioned about their decision not to view the lap band surgery as necessary to permit her to achieve maximum medical improvement, and that their bias or prejudice against allowing or paying these types of claims would be something

6

a judge or jury would want to know.

## II. Discussion

### A. The Motion to Strike

As the Court's description of the parties' arguments on this motion highlights, the key question is whether State Farm was entitled to postpone production of at least one of its medical reports until it obtained Ms. Pollock's pre-injury medical records. If it had good reason to delay that report until its motion to compel resolved the issue of those records' relevance, which occurred in this case through Ms. Pollock's agreement to authorize their release, then an extension of the date for producing Dr. Mikami's report would be based on a showing of good cause. *See, e.g., E.E.O.C. v. Dolgencorp, LLC,* 2011 WL 1260241 (M.D.N.C. March 31, 2011). It is important to note that State Farm's showing of good cause does not depend on whether the pre-injury medical records actually contain relevant information, but only on whether State Farm has made a substantial argument that they were discoverable - that is, reasonably calculated to lead to the discovery of admissible evidence - so that its decision to await their production was a reasonable one.

The Court finds that State Farm acted with reasonable diligence in this case when it moved to compel production of these records and delayed the production of Dr. Mikami's report until after he had a chance to review them. Despite the fact that State Farm did not have these records when it initially denied Ms. Pollock's claim, the liability issue in this case does not turn on the question of whether, on the basis of the records it had before it, State Farm reached the correct conclusion. That might be true in an ERISA case, where the Court's review of an insurer's decision to deny a claim is confined to the administrative record, *see Wilkins v. Baptist*

*Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998), but this is not such a case, and the Court's review of State Farm's decision is both *de novo* and based on the evidence the parties are able to obtain via discovery and otherwise.  Just as Ms. Pollock is entitled to present new evidence explaining why she believes that the lap band surgery was medically necessary to address injuries she sustained in the accident, so is State Farm entitled to provide evidence to the Court to support its position, whether it had that evidence or not at the time it made its decision. Should the Court conclude that State Farm made an incorrect decision, its efforts, if any, to obtain additional evidence prior to the time that it denied coverage would be relevant to a bad faith claim, but it is not precluded from defending its coverage decision on the basis of additional evidence.

That being the case, an insurer such as State Farm might reasonably believe that the pre-injury medical records would shed light on the origin and nature of any pre-existing back condition or obesity condition from which Ms. Pollock suffered.  Indeed, Dr. Rutherford's report, which Ms. Pollock filed with the Court as an exhibit to her motion, contains a detailed review of the post-injury records and confirms that they make various references to pre-existing conditions relating both to back pain and efforts to treat obesity.  Discovery of such information is typically permitted in any case where medical causation is contested; in some jurisdictions, an injured plaintiff is actually required to prove that a particular injury was not caused by a pre-existing condition once there is evidence of such a condition.  *See, e.g., Brusso v. Imbeault*, 699 F.Supp.2d 567 (W.D.N.Y. 2010).  Thus, State Farm made a reasonable discovery request, and a reasonable decision to defer an expert report about the relevance of pre-existing conditions until its request had been satisfied.

Ms. Pollock has argued, however, that it would have been better for State Farm to have submitted Dr. Mikami's report about the significance of the post-injury records first, and then to supplement his report with anything of relevance which he might have found in the pre-injury records. That procedure is not dramatically different than the one State Farm chose to follow, nor would it likely have advanced the case significantly; Ms. Pollock would probably have chosen not to depose Dr. Mikami until his report was supplemented in order to avoid the risk of being unable to take a second deposition once he completed his work. The Court therefore finds good cause for extending the deadline for production of his report and, conversely, no basis upon which to grant the motion to strike. That motion will be denied.

### B. The Motion to Reconsider

Because the motion for a protective order has been brought before the Court by way of a motion to reconsider the Magistrate Judge's order, Ms. Pollock has the burden of demonstrating error in that order. Because the Magistrate Judge's order involves nondispositive matters, this Court's reconsideration of the order is governed by the "clearly erroneous or contrary to law" standard of review contained in Rule 72(a). *See United States v. Curtis*, 237 F.3d 598, 603 (6th Cir.2001). The "clearly erroneous" standard applies to factual findings made by the Magistrate Judge while legal conclusions are reviewed "under the more lenient 'contrary to law' standard." *Gandee v. Glaser*, 785 F.Supp. 684, 686 (S.D.Ohio 1992), *aff'd*, 19 F.3d 1432 (6th Cir.1994) (table). A finding is "clearly erroneous" only when the reviewing court is left with the definite and firm conviction that a mistake has been made. *See In re Search Warrants Issued Aug. 29, 1994*, 889 F.Supp. 296, 298 (S.D.Ohio 1995) (citations omitted). A court's review under the "contrary to law" standard is "plenary, ... and it 'may overturn any conclusions of law which

9

contradict or ignore applicable precepts of law, as found in the Constitution, statutes, or case precedent.' " *Gandee*, 785 F.Supp. at 686 (citations omitted).

It is ordinarily the case that the District Judge need not consider any argument not presented to the Magistrate Judge. *Cf. Carter v. Wilkinson*, 200999 WL 891748, *5 (S.D. Ohio March 30, 2009) (Marbley, J.).   For the same reasons which the Magistrate Judge articulated in his order of June 12, 2012 (Doc. 38), the Court agrees that evidence of bias - systemic or otherwise - on the part of State Farm's claims handlers is irrelevant to the Court's interpretation of the relevant policy language, at least to the extent that the language is unambiguous and can be construed without reference to extrinsic evidence.  It is also largely irrelevant on the medical issue of causation which appears to underlie the language; whether the back injury Ms. Pollock suffered caused her to need lap band surgery is primarily a medical question, and the parties' respective medical experts will express their opinions on that issue.  But the focus of Ms. Pollock's final argument, which is on the concept of maximum medical improvement, requires further consideration.  As noted, although she did not directly articulate this rationale when arguing the matter before the Magistrate Judge, she has consistently maintained that the credibility of State Farm's claims handlers will be an issue, and this is a variation on that theme.  The Court exercises its discretion to evaluate this argument to see if it makes some difference in how the limitation on discovery imposed by the Magistrate Judge's order ought to be applied.

Presumably, Ms. Pollock's argument under the pertinent policy language goes something like this.  The language, worth repeating here, which she has seized on (and which the Court quotes from the copy of the policy State Farm filed as an exhibit to its motion to compel discovery, Doc. 26) provides coverage for "reasonable expenses incurred for ***bodily injury***

caused by accident" including "expenses for necessary medical ... services...." Policy, Section II, Medical Payments - Coverage C.  "Services" are deemed "necessary only if the services are rendered by a medical provider ... and are essential in achieving maximum medical improvement for the ***bodily injury*** sustained in the accident."  Clearly, obesity is neither a bodily injury nor something which Ms. Pollock sustained in the accident, but she appears to contend that in order for her to achieve maximum improvement for the back injury she sustained once it failed to respond to other modalities of treatment, something had to be done to alleviate her weight problem which, in her view, was preventing her from getting better.  Since her obesity had not responded to prior treatment (i.e. dieting and exercise), the lap band surgery was the only remaining treatment, and she would not have been able to reach maximum medical improvement on the back injury without it.  In her view, this is not strictly a medical issue, nor one which is susceptible of purely objective proof.

The Court has the benefit of Dr. Rutherford's report which, as State Farm has stated, was actually prepared prior to litigation, and which apparently formed at least part of the basis for State Farm's decision to deny reimbursement for the lap band surgery.  Dr. Rutherford was asked by State Farm to determine if the lap band surgery was medically necessary to treat her July, 2009 injury - he said it was not - and he was also asked if any of the evaluations or procedures relating to that surgery or the surgery itself was necessary for her to achieve maximum medical improvement.  Again, he said it was not.  *See* Doc. 28, Exhibit A.  The Court has also reviewed the subjects on which Dr. Mikami has been asked to express an opinion, which is set forth in the same Exhibit, and they include essentially the same subjects that Dr. Rutherford addressed.  The record does not reflect that State Farm has identified any of its claims handlers as persons from

whom expert testimony will be elicited, either on medical relatedness issues or on matters relating to the interpretation of the policy.

Given this state of the record, it appears to the Court that Ms. Pollock will support her claim for coverage by introducing medical testimony on the issues of medical relatedness and what treatment was necessary for maximum medical improvement.  State Farm will then attempt to rebut this testimony through expert testimony.  Neither party is likely to be calling the claims handler or handlers who denied the claim to testify on those issues because they would have no competent testimony to offer, nor has anyone identified them as experts in the medical field. Further, given that State Farm objected to their giving testimony at deposition on the issue of what constitutes treatment necessary for an injured person to reach maximum medical improvement, State Farm could not properly offer them up as witnesses on this point; if it did, the Court would almost surely sustain an objection to any such testimony because of State Farm's refusal to allow them to be questioned on that subject.

Ms. Pollock appears to concede that these witnesses will probably not be testifying on the medical issues, noting in her supporting memorandum (Doc. 40, at 6) that "[i]t may be unlikely that a State Farm employee will render an opinion regarding relatedness." However, she argues that this is "beside the point" because the evidence of systemic bias can be used to impeach whatever testimony they do offer.  As examples of what they might testify to, she speculates that they may testify about why State Farm chose to have Dr. Rutherford do the initial evaluation of her claim or why State Farm selected Dr. Mikami as an expert witness, and that their motives may be tied to some belief that these doctors were likely to give State Farm the opinion it wanted, thus allowing it to deny Ms. Pollock's claim (and enhancing the claims handlers'

financial compensation).

As with any discovery issue, the touchstone is whether questions about systemic bias within State Farm against paying first-party medical pay claims are "reasonably calculated to lead to the discovery of admissible evidence" that is "relevant to any party's claim or defense ...." Fed.R.Civ.P. 26(b)(1). While this is undeniably a broad standard, it still requires the Court to find a logical nexus between the requested discovery and a claim or defense, which, in this case, is currently limited to the question of coverage. Testimony from claims handlers or other State Farm representatives regarding bias against paying this type of claim will neither prove nor disprove Ms. Pollock's claim that coverage exists or State Farm's defense that the "medically necessary" requirements of the policy have not been satisfied. Such evidence might be pertinent on credibility issues, if there are any, but State Farm representatives themselves will have no testimony to offer on the medical relatedness and medically necessary issues, so there is nothing on that subject about which they could be impeached. Additionally, they would not likely be allowed by the Court to offer their interpretations of the policy, at least in the coverage phase of the case; "what a 'reasonable claims handler' would conclude about coverage essentially duplicates the contract interpretation analysis that is the province of the Court," whether that testimony is offered by a purported expert on claims handling procedures (as was the case in *American Safety Cas. Ins. Co. v. City of Waukegan*, 2011 WL 98596, *3 (N.D. Ill. Jan. 12, 2011), from which the quoted language is taken), or, as here, by the claims handlers themselves. In fact, courts routinely prohibit independent expert testimony on such issues because an expert's "opinions on the issue of contract construction would not assist the jury in understanding coverage, are based solely on [the expert]'s subjective interpretation of the policy language, and

13

are impermissible legal conclusions." *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 410 F.Supp.2d 417 (W.D. Pa. 2006). *See also Arbol Media, Inc. v. Hartford Cas. Ins. Co.*, 2003 WL 25669170, * 1 (C.D. Cal. July 7, 2003) (policy interpretation "is a question of law and is not appropriate for expert testimony").

That leaves, as the only possible area where State Farm's representatives might offer testimony relevant to the medical issues, questions about State Farm's relationship with, and its belief as to the proclivities of, its medical experts. Medical expert bias is something the jury in this case should know about, if there is any. But the Magistrate Judge's order did not appear to preclude Ms. Pollock from asking those types of questions; the motion for a protective order focused exclusively on subjects relating to the alleged bias of State Farm employees and not bias of either Dr. Rutherford or Dr. Mikami. Further, Ms. Pollock does not assert that she was prevented from asking, during the Rule 30(b)(6) deposition, questions about either the decision to refer the case to Dr. Rutherford for evaluation, or questions about the relationship between either of State Farm's two experts and State Farm, including how often they have been called upon as experts, how much they earn from consulting with State Farm, or how frequently they issue opinions which favor the insurer over the insured. Those subjects are not included in her Rule 30(b)(6) deposition notice. *See Motion for Protective Order,* Doc. 32, Exhibit 2. Thus, while the Court agrees that information concerning any potential bias on the part of Dr. Rutherford or Dr. Mikami is relevant and discoverable, because the order which Ms. Pollock seeks reconsideration of does not hold otherwise or preclude her from obtaining such discovery, this conclusion does not undermine the validity of that order.

### III. Conclusion

For all of these reasons, the Court **DENIES** Plaintiff's motion to strike (Doc. 28) and Plaintiff's motion for reconsideration (Doc. 40).   To the extent that State Farm has not done so already, it shall produce a report from Dr. Mikami within fourteen days of the date of this order. The discovery cutoff date is extended to April 30, 2013, to permit the completion of expert discovery on the coverage issue.

**IT IS SO ORDERED.**


                                                                                          s/Algenon L. Marbley
                                                                                            Algenon L. Marbley
                                                                                    United States District Judge

DATED: March 19, 2013